[Cite as *State v. Anglin*, 2019-Ohio-588.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2018-03-058 |
| | : | O P I N I O N |
| - vs - | | 2/19/2019 |
| | : | |
| BRANDON W. ANGLIN, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2017-08-1489


Michael T. Gmoser, Butler County Prosecuting Attorney, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Michele Temmel, 6 South Second Street, Suite 305, Hamilton, Ohio 45011, for appellant


**PIPER, J.**

{¶ 1}   Appellant, Brandon Anglin, appeals his conviction in the Butler County Court of Common Pleas for rape.

{¶ 2}   On June 19, 2017, K.M. and G.M. shared a bottle of wine at G.M.'s apartment in Oxford, Ohio, then walked to Brick Street Bar and Grill to watch karaoke. At Brick Street, the two continued drinking alcoholic beverages, including mixed drinks and a shot of dark

liquor for G.M. While at Brick Street, G.M. and K.W. met Anglin, one of the karaoke participants. Prior to that night, neither G.M. nor K.W. had ever met Anglin.

{¶ 3} When Brick Street closed at 2:30 a.m., Anglin, G.M., and K.W. began walking toward G.M.'s apartment. Because of G.M.'s level of intoxication, K.W. put G.M. to bed after the three arrived at G.M.'s apartment. K.W. and Anglin left the apartment, and K.W. locked the front door behind them.

{¶ 4} Upon arriving at K.W.'s apartment about 15 minutes away, Anglin attempted to kiss K.W., but she rejected his attempts and he left. Shortly after, K.W. discovered she had G.M.'s cellphone. Knowing G.M. needed her cellphone for her employment the next morning, K.W. walked back to G.M.'s apartment to return it. After arriving back at the apartment, K.W. noticed Anglin sitting on G.M.'s car, which was parked in front of her apartment.

{¶ 5} Due to Anglin's unexplained presence at G.M.'s apartment, K.W. walked to a nearby gas station within sight of the apartment to call the police. However, by the time she arrived at the gas station, K.W. no longer saw Anglin in front of G.M.'s apartment or sitting on G.M.'s car. Believing Anglin was no longer around, K.W. did not call the police but proceeded back to G.M.'s apartment to return the cellphone.

{¶ 6} Because the front door was locked, K.W. entered the apartment through an unlocked window directly in front of G.M.'s parked car. Upon entering the apartment, K.W. heard movement and noises coming from G.M.'s bedroom. Feeling concerned for G.M., K.W. knocked on the bedroom door. After several minutes of knocking, a disoriented G.M. opened the bedroom door, and K.W. observed Anglin on G.M.'s bed partially clothed. G.M. began crying and convinced Anglin to leave.

{¶ 7} G.M. called the police and subsequently submitted to a sexual assault examination within a few hours. Ultimately, semen consistent with Anglin's DNA was found

on swabs taken from G.M.'s vaginal area. Thereafter, Anglin was indicted for rape and sexual battery. The jury returned guilty verdicts on both counts. The trial court merged the two offenses for sentencing purposes, and the state proceeded on the rape charge. As a result, the trial court sentenced Anglin to a mandatory four-year prison term. Anglin now appeals his conviction, raising the following assignment of error:

{¶ 8} THE EVIDENCE WAS INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR RAPE AND SEXUAL BATTERY AND THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 9} In his sole assignment of error, Anglin argues that his rape conviction is not supported by sufficient evidence, and was otherwise against the manifest weight of the evidence.

{¶ 10} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 11} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in

resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 12} In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 13} Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, a "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 14} After the trial court merged Anglin's charges, the state elected to proceed on the rape charge. Pursuant to R.C. 2907.02(A)(1)(c):

> No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition[.]

{¶ 15} Anglin argues that his rape conviction is against the manifest weight of the evidence because the state failed to show that G.M. was substantially impaired or that Anglin knew or had reason to know of any such impairment.

{¶ 16} The Ohio Supreme Court has held that "substantial impairment" must be established by demonstrating a present reduction, diminution or decrease in the victim's

- 4 -

ability, either to appraise the nature of her conduct or to control her conduct. *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987).

{¶ 17} Substantial impairment may be proven by the victim's own testimony, allowing the trier of fact to observe and evaluate the victim's ability to either appraise or control her conduct, and by the testimony of others who have interacted with the victim. *State v. Bai*, 12th Dist. Butler No. CA2010-05-116, 2011-Ohio-2206, ¶ 54. A substantial-impairment determination is made on a case-by-case basis, with great deference to the factfinder. *State v. Kilbarger*, 12th Dist. Fayette No. CA2013-04-013, 2014-Ohio-2341, ¶ 11, citing *Bai* at ¶ 53.

{¶ 18} After reviewing the record, we find that Anglin's rape conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. The state first presented testimony from K.W., the friend who was with G.M. for most of the evening in question. K.W. testified that she and G.M. began drinking at G.M.'s apartment, and that G.M. had several alcoholic drinks while at Brick Street. K.W. further testified that during their walk back to the apartment, G.M. stopped conversing with or responding to K.W. K.W. inferred that G.M. had consumed too much alcohol and that G.M.'s intoxication impacted G.M. on the walk home. K.W. then testified that because the alcohol "seemed to hit [G.M.] a little bit harder towards the end of that night," she put G.M. to bed to ensure G.M. was "in her room, in her apartment, and in a safe place." K.W. described G.M. as "pretty incapacitated" at that time.

{¶ 19} K.W. further testified that after returning with G.M.'s cellphone, K.W. was concerned when she heard noises coming from G.M.'s room due to her friend's condition. Additionally, K.W. indicated G.M. "looked very out of it" and "wouldn't look directly at [K.W.]" when she opened her bedroom door. After Anglin left the apartment, K.W. testified G.M. was sobbing, confused, and disoriented. K.W. indicated that at that time, G.M. did not know what was happening and could not recall what happened earlier.

{¶ 20} G.M. testified at trial that she and K.W. had about two glasses of wine at G.M.'s apartment before heading to Brick Street. After arriving, the two continued drinking mixed drinks while they listened to karaoke. After karaoke began, Anglin introduced himself to G.M. as "Shaggy," a nickname he was often called. According to G.M., she was uninterested in Anglin, and had no desire to continue talking with him. After meeting Anglin, G.M. drank a shot of liquor with the bartender and then returned to the table where she and K.W. were seated. Returning to the table is the last memory G.M. had from Brick Street that evening.

{¶ 21} G.M. testified her next memory from the evening was being partially in her bed, feeling sick and nauseous when she heard an unrecognizable man's voice asking, "Are you okay, sweetie?" G.M. testified that she felt uncomfortable, panic-stricken, and that something was wrong. At that point, G.M. recalled K.W. banging on her bedroom door, and screaming "Get out!" at Anglin. After Anglin left her apartment, G.M. called her mother and boyfriend. G.M. told her mother she may have been "taken advantage of."

{¶ 22} After speaking with her mother and calling the police, G.M. went to the hospital. G.M. described feeling disoriented and physically sick at the hospital, like she "had had a lot to drink." G.M. testified she did not remember much from that night, but she knew she had "a lot to drink" for someone her size.

{¶ 23} The jury then heard testimony from the Sexual Assault Nurse Examiner who performed the sexual assault examination of G.M. The nurse testified to collecting various samples from G.M., including swab samples from G.M.'s vaginal area. The nurse further testified that after completing the sexual assault exam, she collected G.M.'s blood and urine at 8:39 a.m.

{¶ 24} The state also presented testimony from the forensic toxicologist who generated the alcohol and drug testing report for G.M.'s blood and urine samples. The forensic toxicologist testified to a reasonable degree of scientific certainty that G.M.'s blood

alcohol content ("BAC") was 0.107 at 8:39 a.m., which is greater than the legal limit of 0.08. She further testified that due to the way alcohol is metabolized, the amount of alcohol in G.M.'s system would have been declining since G.M.'s final drink was absorbed. As such, the forensic toxicologist indicated she expected G.M.'s BAC would have been higher at 2:30 a.m. than it was at 8:39 a.m.

{¶ 25} The jury also heard testimony from a forensic scientist with the Ohio Bureau of Criminal Investigation, who testified to a reasonable degree of scientific certainty that she identified semen on the vaginal swab from G.M.'s sexual assault examination. The state then presented testimony from a DNA analyst with the Ohio Bureau of Criminal Investigation, who testified with a statistical estimate of one in 200 million, that the DNA from the vaginal swab came from Anglin.

{¶ 26} The state questioned the officer who took Anglin's statement following the incident. The officer testified he took Anglin to the police department to get a video statement from Anglin. The jury then viewed the video recording of Anglin's interview with the officer, wherein Anglin described what happened that night.

{¶ 27} According to the video, Anglin believed K.W. and G.M. had been flirting with him all night, however, he was initially interested in K.W. because she was "more sober" than G.M. Anglin confirmed that he walked G.M. and K.W. home, and that after dropping off K.W., he returned to G.M.'s and was knocking on her door when K.W. returned with G.M.'s cellphone. After K.W. left, Anglin continued knocking on G.M.'s windows and doors to awaken G.M. He then stated G.M. opened her bedroom curtains partially clothed and gestured for him to come in through the living room window. At that time, Anglin speculated G.M. was too drunk to deal with the door. After entering the apartment from the window, Anglin went to G.M.'s bedroom. Anglin admitted he engaged in oral sex with G.M., but claimed no penetration occurred. Shortly thereafter, G.M. told Anglin she was sick and

nauseous. Anglin indicated he understood because he had "been at the bar drinking with [G.M.] all night." According to Anglin, he was comforting G.M. when K.W. began knocking on G.M.'s door. Anglin stated he did not do anything that he was not invited or asked to do.

{¶ 28} On the video, Anglin stated that G.M. was drunk several times and that G.M. may not have known exactly "who's who or what's what." He admitted he told G.M. that he was not Paul, the bartender from Brick Street. According to Anglin, he wanted to clarify he was not Paul because, "when a girl is drunk, you're not quite sure what they are aware of," and he needed "to double check [G.M. was] aware of what's going on." Anglin further stated he wanted to make sure G.M. was "okay" because he and K.W. had just dropped her off "not too long ago," and because he knew G.M. was drunk and she may not want to do "this."

{¶ 29} Based on our review, we find that the jury's determination that G.M.'s ability to resist or consent was substantially impaired due to her level of intoxication and alcohol consumption was not against the manifest weight of the evidence. Specifically, the jury heard testimony regarding the amount G.M. had to drink on the night in question and that K.W. had to put G.M. to bed. Furthermore, G.M. was described as confused, disoriented, incapacitated, and physically sick. The jury also heard G.M.'s testimony that she was not interested in Anglin and could not recall most of the evening. It was also established that several hours after the encounter, the amount of alcohol in G.M.'s system was over the legal limit. Moreover, Anglin's own description of the night, and his observations concerning G.M.'s condition, illustrate that Anglin knew or at least had reasonable cause to believe G.M. was substantially impaired.

{¶ 30} The mere fact that the jury chose to disbelieve the defense theory of G.M.'s level of intoxication and her encounter with Anglin, and instead chose to believe the state's version, is insufficient to find that the jury lost its way or created a manifest miscarriage of justice. Based on the evidence presented, the jury could reasonably have found beyond a

reasonable doubt that Anglin committed rape. As such, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that Anglin's conviction must be reversed and a new trial ordered. Anglin's assignment of error is therefore overruled.

{¶ 31} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.