[Cite as *State v. Lawrence*, 2020-Ohio-855.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2017-06-078<br>CA2019-03-048 |
| | : | |
| - vs - | : | O P I N I O N<br>3/9/2020 |
| | : | |
| DUSTIN TREVINO LAWRENCE, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2016-10-1598

Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Caparella-Kraemer & Associates, LLC, Tyler W. Nagel, 4841-A Rialto Road, West Chester, Ohio 45069, for appellant

**HENDRICKSON, P.J.**

{¶ 1} Appellant, Dustin Lawrence ("Lawrence"), appeals from his convictions and sentence in the Butler County Court of Common Pleas for rape, domestic violence, kidnapping, and gross sexual imposition.

{¶ 2} Following allegations of sexual abuse by S.K., the minor daughter of

Lawrence's girlfriend, Lawrence was indicted on five counts of rape, and single counts of domestic violence, kidnapping, and gross sexual imposition. The charges arose from allegations that between March 15 and 16, 2016 Lawrence orally and vaginally raped S.K. in her home and committed domestic violence against her mother ("Mother"). S.K. was 16 years old at the time of the alleged rapes.

{¶ 3} A three-day jury trial commenced in March 2017. At trial, the state presented testimony of eight witnesses, including S.K., her father ("Father"), her friend, a SANE nurse, a BCI forensic scientist, a BCI forensic scientist in the DNA field, a Hamilton police detective, and Mother. At the close of the state's case in chief, the trial court denied Lawrence's motion for acquittal pursuant to Crim.R. 29. Lawrence testified in his defense.

{¶ 4} The jury returned guilty verdicts on all counts. On May 3, 2017, the trial court sentenced Lawrence to 18 months in prison for the gross sexual imposition conviction (Count 1), 11 years in prison for three of the rape convictions (Counts 2, 3, and 4), and 18 months in prison for the domestic violence conviction (Count 8). The court ordered Count 2 to be served concurrently with Count 1; Counts 3 and 4 to be served consecutively to Count 2 and to each other; and Count 8 to be served concurrently with Count 4. The remaining counts were merged for sentencing purposes. In total, the trial court sentenced Lawrence to an aggregate prison term of 33 years.

{¶ 5} Lawrence filed a direct appeal and was appointed counsel.[1] In August 2018, while his direct appeal was pending with this court, Lawrence filed a petition for postconviction relief ("PCR") arguing his sentence was in violation of due process because

---

1. In the direct appeal, Lawrence's appointed counsel filed a brief pursuant to *Anders v. California*, 286 U.S. 738, 87 S.Ct. 1396 (1967). Lawrence also filed a pro se brief, which raised seven assignments of error and claimed his case was not appropriate for briefing pursuant to *Anders*. In a per curiam decision, this court found that an *Anders* brief was not appropriate for this appeal, and appointed new counsel to represent Lawrence. *State v. Lawrence*, 12th Dist. No. CA2017-06-078, 2018-Ohio-3987, ¶ 38-40.

it was based upon inaccurate information in the presentence investigative report ("PSI report"), and that he was denied the effective assistance of counsel. After review, the trial court found merit to the sentencing argument, but denied the ineffective assistance of counsel claim. Because the trial court found merit to the sentencing argument, this court remanded the direct appeal.[2] This court later affirmed the denial of Lawrence's PCR ineffective assistance of counsel claim. *State v. Lawrence*, 12th Dist. Butler No. CA2018-11-208, 2019-Ohio-2788, ¶ 23.

{¶ 6} Thereafter, the trial court held a meeting in chambers to discuss Lawrence's sentencing arguments in the PCR. Shortly after the meeting, the trial judge entered an entry of recusal, which explained that "a family member of the Court had been the victim of a similar crime which may have impacted the Court's original sentencing determination." The case was then reassigned to a new judge.

{¶ 7} After the case was reassigned, the parties stipulated that Lawrence was entitled to a new sentencing hearing because the trial court relied upon inaccurate information in the PSI report when determining Lawrence's sentence. As a result, the trial court held a resentencing hearing on March 13, 2019. At the hearing, the trial court granted relief on the petition's sentencing claim, vacated Lawrence's sentence, and resentenced Lawrence based on a corrected PSI report. In ordering Lawrence's new sentence, the trial court entered 9-year prison terms for Counts 2, 3, and 4. In all other respects, Lawrence's sentence remained the same. As a result, the trial court sentenced Lawrence to an aggregate prison term of 27 years. The case was then returned to this court.

{¶ 8} In this appeal, Lawrence raises four assignments of error for our review.

---

2. This court further indicated that any appeal from the resentencing proceedings would be consolidated with Lawrence's direct appeal.

{¶ 9} Assignment of Error No. 1:

{¶ 10} THE TRIAL COURT ERRED BY FAILING TO DISCLOSE POTENTIAL BIAS AGAINST APPELLANT AT THE EARLIEST OPPORTUNITY.

{¶ 11} Assignment of Error No. 2:

{¶ 12} APPELLANT WAS DEPRIVED OF HIS RIGHT TO A TRIAL BEFORE AN IMPARTIAL JUDGE, IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS.

{¶ 13} In his first and second assignments of error Lawrence argues that because the trial judge failed to disclose his potential bias at the earliest opportunity, and failed to recuse himself before the trial began, Lawrence was deprived of his right to a trial before an impartial judge. As such, Lawrence contends he is entitled to a new trial before an unbiased judge.

{¶ 14} Lawrence's judicial bias claims stem from statements made in chambers by the trial judge on October 24, 2018. According to an affidavit executed by Lawrence's counsel on November 1, 2018, the trial judge "disclosed that he had been thinking about Mr. Lawrence's sentence for a long time. He was happy to have a chance to revisit the sentence." According to the affidavit, the judge's daughter had been the victim of a similar crime when she was similar in age to S.K. Considering his daughter's situation, the judge "was afraid that he had allowed the situation with his daughter to affect his sentence in Mr. Lawrence's case, particularly as it related to the consecutive nature of the sentences." "At one point, [the judge] said he was afraid that he was biased at sentencing, not so much against Mr. Lawrence himself, but because of the nature of the crime and similarity of his daughter's situation." Due to the judge's statements, the state recommended the judge recuse himself from Lawrence's case. A few days later, on November 2, 2018, the trial

- 4 -

judge filed an entry of recusal. Lawrence filed the executed affidavit with the trial court on March 15, 2019.

{¶ 15} Based upon the judge's statements of potential bias, Lawrence concludes that "if [the judge's] ability to be fair and impartial at sentencing was questionable, there exists a strong possibility, if not a probability, that his ability to be fair and impartial throughout the proceedings was impaired." After reviewing the record, we find Lawrence's claim fails for two reasons. First, we find Lawrence has waived his judicial bias claims, as he failed to amend his PCR petition or otherwise raise the issue of the judge's personal bias in the PCR proceedings, despite learning of the alleged bias when his petition remained pending with the trial court. In the alternative, even if his claims are not waived, Lawrence has failed to present any evidence that the judge was biased at Lawrence's trial.

{¶ 16} A PCR petition in Ohio is a statutorily created remedy set forth in R.C. 2953.21 and designed to provide an avenue to correct a violation of a defendant's constitutional rights in his criminal trial. It is a means by which the petitioner may allow the court to reach constitutional issues that would otherwise be impossible to review because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction. *State v. Murphy*, 10th Dist. Franklin No. 00AP233, 2000 Ohio App. LEXIS 6129, *2 (Dec. 26, 2000).

{¶ 17} Pursuant to R.C. 2953.21(G), "[a]t any time before [an] answer or motion is filed, [a] petitioner may amend the petition with or without leave or prejudice to the proceedings. The petitioner may amend the petition with leave of court at any time" thereafter. R.C. 2953.21(A)(4) requires a petitioner to "state in the original or amended petition filed under division (A) of this section all grounds for relief claimed by the petitioner." Except as provided in R.C. 2953.23, inapplicable here, "any ground for relief that is not so

stated in the petition is waived." *Id.*

{¶ 18} Here, Lawrence timely filed a PCR petition alleging his sentence was based upon inaccurate information and that his trial counsel was ineffective. That petition was granted with regard to Lawrence's sentencing claim. While the petition remained pending in the trial court, Lawrence learned of the trial judge's concern of bias and the affidavit detailing the judge's concern was prepared and executed. Despite his pending petition, Lawrence did not attempt to amend his petition to include the judicial bias arguments he now raises on appeal. Instead, Lawrence postponed raising the issue, and filing the affidavit, until after he was granted relief on the remaining claim of his PCR petition. At that time, the PCR petition had been disposed of by the trial court, and the case was transferred back to this court. The claim of bias, supported by evidence dehors the record, is proper for a PCR petition. Thus, pursuant to R.C. 2953.21(A)(4), Lawrence waived the grounds he asserts on appeal when he failed to amend his petition in the trial court to include them.

{¶ 19} As such, because Lawrence now raises additional claims that were not raised in his PCR petition or the PCR proceedings, we find he waived them. See *State v. Barb*, 8th Dist. Cuyahoga No. 94054, 2010-Ohio-5239, ¶ 25, citing *State v. McKee*, 9th Dist. Lorain No. 96CA006599, 1997 Ohio App. LEXIS 4433, *9 (Oct. 1, 1997) (failure to raise issue in petition for postconviction relief results in a waiver of the right to assert the issue on appeal).

{¶ 20} In the alternative, even if we were to assume Lawrence preserved the issue for appeal, he has failed to establish the trial judge exhibited bias or prejudice at trial. "Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state

of mind which will be governed by the law and the facts.'" *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus.

{¶ 21} "A judge is presumed not to be biased or prejudiced, and a party alleging bias or prejudice must present evidence to overcome the presumption." *Wardeh v. Altabchi*, 158 Ohio App. 3d 325, 2004-Ohio-4423, ¶ 20 (10th Dist.). "The appearance of bias or prejudice must be compelling to overcome this presumption of integrity." *Trott v. Trott*, 10th Dist. Franklin No. 01AP-852, 2002-Ohio-1077, *11, citing In re *Disqualification of Olivito*, 74 Ohio St.3d 1261, 1263 (1994). "The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party." *Okocha v. Fehrenbacher*, 101 Ohio App.3d 309, 322 (8th Dist.1995).

{¶ 22} Lawrence argues there are three "examples in the record of how [the judge's] bias may have affected the course of the trial." First, Lawrence argues the judge's bias was exhibited when he allowed S.K. to take a break and speak with victim advocates during a "critical part" of her direct examination. We disagree.

{¶ 23} The record reflects S.K. was testifying on direct examination regarding the events of March 15, 2016 when she became upset, indicated she was "really hot," and that she could not recall the next thing that happened. At that point, the prosecutor told S.K. to take some deep breaths and that there were Kleenexes and water available. The prosecutor then asked S.K. if she would like to take a break. At that point, defense counsel objected and indicated, "if you're going to take a break, no one * * * should have any conversations with this witness." The jury was then excused, and counsel discussed the issue with the judge. The state proposed that S.K. talk with the two victim advocates. The

trial court informed the victim advocates that they "may try to soothe [S.K.] in any fashion that [they] like, but [they] may not talk about the events of March 15th or 16th." In response, defense counsel stated the following: "[W]ith the assurances of the prosecutor that there won't be any conversation with her and the other witnesses or her grandparents with the people that are out there, then I am fine[.]" At that point, S.K. and the victim advocates went through a private hallway and entered a small conference room. Thereafter, S.K. resumed her testimony.

{¶ 24} After reviewing the above, we find no error or prejudice in allowing S.K., a young victim who became emotional during direct examination, to take a break during her testimony. As an initial note, the trial court is given "control [of] all proceedings during a criminal trial" and therefore, "[t]he trial judge ha[s] the discretion to order a recess to ensure that the trial unfold[s] in an orderly process." *State v. Randle*, 3d Dist. Marion No. 9-17-08, 2018-Ohio-207, ¶ 32, citing R.C. 2945.03. As such, it was within the trial court's discretion to order a recess when S.K. became generally unresponsive and emotional on direct examination. Moreover, the record reflects the trial court ordered the recess after directing the victim advocates not to discuss S.K.'s testimony and that defense counsel agreed with a recess at that time in light of the limitations imposed by the judge and assurances of the prosecutor. There is no evidence in the record that the victim advocates disobeyed the judge's order or that any inappropriate topics were discussed during the recess. Accordingly, given the age of the victim, the sensitivity of her testimony at the time of the recess, and the judge's instruction to the victim advocates, it was within the trial court's discretion to allow a short break during S.K.'s testimony. Consequently, because the trial court acted within its discretion, its decision to allow a short recess does not suggest undue friendship or favoritism toward S.K. or the state, nor were its actions indicative of any bias

or prejudice.

{¶ 25} Next, Lawrence claims the trial court's reference to Mother and S.K. as "victim[s]" in the presence of the jury establishes the trial court's bias. The record reflects the trial court used the word "victim" to describe Mother on the first and second day of trial. On the first day of trial, the court explained to Mother that, as the victim of the domestic violence charge of the indictment, she was entitled to be in the courtroom for any and all parts of trial. Thereafter, a discussion occurred regarding Mother's presence in the courtroom during S.K.'s testimony. The judge ultimately stated: "If you [Mother] would like to be in here, then we'll go from there and see if there's an objection to it." The following day, before any witness testimony was presented, and in the presence of the jury, the trial court stated: "One issue before we get going. We do have – the victim has taken advantage of my instruction. Was there going to be any argument as to whether that's permissible or not? Okay." There was no objection at that time. After reviewing the two instances cited by Lawrence, it is evident the trial court referred to Mother as the victim, not S.K., and only did so in an effort to explain her right, as a victim of domestic violence, to be present in the courtroom during trial. We do not consider this language to be inherently prejudicial to Lawrence, nor does it exhibit bias on behalf of the trial judge.

{¶ 26} Lastly, Lawrence contends the trial court exhibited bias when it suggested an objection based on relevance, as opposed to the state's annunciated objection based on hearsay. According to the record, during Lawrence's direct examination, counsel elicited testimony regarding a conversation Lawrence had with S.K. the day after the alleged assault. At that point, the prosecutor objected on "multiple levels" but identified the "simplest one" as hearsay. The judge responded that he could not see any relevance to the statement, and told the prosecutor, "if you offer an objection on that basis, maybe that

would be an easy one to sustain." After a discussion, the parties agreed that defense counsel could "clean up" the question and inquire as to whether Lawrence and S.K. had a conversation and whether that conversation was normal. The trial court then sustained the objection, struck Lawrence's original answer, and instructed the jury to disregard the answer. After review, we do not find the trial court displayed any hostile feeling or spirit of ill will toward Lawrence or undue friendship or favoritism toward the state in sustaining the objection. Rather, in attempts to simplify an objection with "multiple levels," the trial court indicated the most obvious basis was relevancy. It is well settled that "dissatisfaction or disagreement with a judge's rulings of law are legal issues subject to appeal. A judge's opinions of law, even if later found to be erroneous, are not by themselves evidence of bias or prejudice and thus are not grounds for disqualification." *In re Disqualification of Corts*, 47 Ohio St.3d 601, 602 (1988). Furthermore, Lawrence has failed to show any prejudice here where defense counsel agreed to use an alternative line of questioning. As such, we conclude that merely sustaining the state's objection to Lawrence's statement does not establish the judge's bias or prejudice at trial.

{¶ 27} In light of the above, Lawrence has failed to present any evidence of judicial bias or prejudice. Instead, Lawrence asks this court to presume that the trial judge was biased or prejudiced at trial simply because the judge expressed a concern that he "may" have been biased at Lawrence's sentencing. Based upon the judge's comments in chambers and in the recusal entry, it is evident he did not admit to actual bias at the sentencing hearing. Rather, the record indicates the judge was second guessing the fairness in his decision to impose consecutive sentences. This does not amount to an acknowledgment of actual bias at sentencing, nor does it implicate any bias or prejudice at trial. We will not presume otherwise. As such, even if the issue had been preserved for

appeal, there is no evidence of judicial bias or prejudice at Lawrence's trial and Lawrence's first and second assignments of error are therefore overruled.

{¶ 28} Assignment of Error No. 3:

{¶ 29} APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 30} In his third assignment of error, Lawrence argues his rape convictions are against the manifest weight of the evidence.

{¶ 31} To determine whether a conviction is against the manifest weight of the evidence, a reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Bradbury*, 12th Dist. Butler No. CA2015-06-111, 2016-Ohio-5091, ¶ 17. An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 18.

{¶ 32} To convict Lawrence for the rape offenses, the state had to prove Lawrence engaged in sexual conduct with the victim by purposely compelling the victim to submit by force or threat of force. R.C. 2907.02(A)(2). Sexual conduct includes vaginal intercourse between a male and female, cunnilingus, and digital penetration of the vagina. R.C. 2907.01(A); *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 38.

{¶ 33} After reviewing the record, we find that Lawrence's rape convictions were not against the manifest weight of the evidence. S.K. testified at trial that in March 2016, Mother and Lawrence were residing with her grandparents in their upstairs bedroom ("the

bedroom"). The bedroom was the only room in the upper level of the home and consisted of a bed and futon. Although S.K. typically lived with Father, she was staying with her grandparents at the time to attend an STNA certification program. While staying at her grandparents' home, S.K. shared the bedroom with Mother and Lawrence.

{¶ 34} On the evening of March 15, 2016, S.K. arrived at her grandparents' home between 9:00 p.m. and 10:00 p.m. and began doing homework on the futon in the bedroom. At some point, S.K. fell asleep, and awoke to Mother and Lawrence returning home from the bar. According to S.K., Mother and Lawrence appeared "really drunk," as her mother "couldn't really walk" and Lawrence was staggering and slurring his words. S.K. tried to ignore the couple and went back to sleep. S.K. awoke a second time to the couple arguing about Mother cheating on Lawrence. At that point, S.K. heard Lawrence threatening Mother and observed him place his hands around Mother's neck and begin choking her near the bed. Because it was normal for Mother and Lawrence to fight, S.K. pretended to be asleep and her mother ultimately went downstairs. After Mother left the bedroom, S.K. saw Mother hiding in a closet. At that point, S.K. texted her friend, B.H., to see if she was awake.

{¶ 35} After the argument with Mother, Lawrence became upset and was crying. He engaged in conversation with S.K. and asked her why Mother was the way that she was. S.K. did not respond but engaged in a hug with Lawrence. At that point, Lawrence moved closer to S.K. and began pushing her shoulders down toward the futon to lay her down. S.K. resisted, but Lawrence continued pushing her down on the futon and began to take her pants off. While attempting to take S.K.'s pants off, Lawrence began touching her breasts on top of her clothing and tried to take her shirt off. Lawrence then removed S.K.'s pants and underwear from her waist and touched her vagina with his tongue. S.K. indicated she said no and attempted to close her legs, but Lawrence pushed her inner thighs apart

with his hands. S.K. estimated the interaction lasted for one minute before Lawrence stopped and began searching for Mother. S.K. also went downstairs to search for Mother but was unsuccessful.

{¶ 36} Unable to find Mother, S.K. returned to the bedroom to collect her "stuff" to leave. At that point, Lawrence asked S.K. if she would like to lay down on the bed, to which she responded yes. Upon sitting on the bed, S.K. noticed it was wet and smelled as if someone had peed the bed. S.K. indicated she would prefer to sleep on the futon, but Lawrence pulled her back into the bed and proceeded to remove her pants and underwear. S.K. told Lawrence to stop, but he got on top of her and began touching the outside and inside of her vagina with his fingers. At that point, Lawrence placed his fingers near S.K.'s face and asked if she "wanted to see how she tasted." He then inserted his penis into S.K.'s vagina while she was on her back. S.K. indicated it hurt when Lawrence "was inside" her, which prompted Lawrence to ask if "he was [her] first." Lawrence then stopped and flipped S.K. onto her side and engaged in vaginal intercourse with S.K. a second time. He proceeded to reposition S.K. onto her back and inserted his penis into her vagina a third time. S.K. admitted she did not call for help, flee the bedroom, yell or scream, or alert her grandparents at any time during the assault.

{¶ 37} Upon hearing a noise from downstairs, Lawrence stopped and got dressed. S.K. also got dressed and began getting ready for school. At that time, Lawrence offered to drive S.K. to school. During the 30-minute drive, Lawrence told S.K. that he loved her, touched her leg, and kissed her on the lips. At school, S.K. discovered bruises on her inner thighs and arms, and cried throughout the day. S.K. testified she told B.H. about the assault that evening after school and disclosed the assault to her father the following day.

{¶ 38} The state then presented testimony from the SANE nurse who completed an

examination of S.K. on March 17, 2016. The nurse described S.K. as very tearful, and further indicated that S.K. had difficulty explaining why she was there and that she "didn't feel safe and was afraid to [say] what had happened out of fear." Specifically, S.K. stated she feared that if she told the nurse what happened, "he" would harm her mother or her sister. After S.K. explained why she was at the hospital, the nurse completed a forensic exam of S.K. During the exam, the nurse observed multiple bruises to S.K.'s upper arms and the inside of her thighs. The nurse also noted that S.K. had an abrasion on her posterior fourchette, which is the tissue present on the inside of the vagina, and an acute tear to her hymen. According to the nurse, the acute tear meant the injury had recently occurred. S.K. also had redness in the area of the abrasion and her labia, which the nurse described as abnormal for a clinical exam. The nurse further testified S.K. expressed a lot of pain and discomfort during the exam, which was "definitely abnormal" during a clinical exam. Due to S.K.'s pain and discomfort, she did not allow the nurse to take photos of her vaginal injuries.

{¶ 39} The nurse also took swabs from inside S.K.'s vaginal area, rectal area, and oral mucosa. The nurse then prepared a rape kit with the samples. S.K.'s rape kit, along with the underwear she wore during the alleged assault, were examined at BCI. The examination revealed that none of the samples taken from S.K. contained semen, however, amylase, a protein found in saliva and other body fluids, was present in S.K.'s underwear. As a result of the examination by BCI, samples from the underwear were forwarded for DNA testing, as well as the vaginal, anal, and skin swabs. During the DNA testing, it was determined through Y-STR testing that an unknown male's DNA was present in S.K.'s vaginal samples. Through comparison with samples received from S.K. and Lawrence, it was further determined Lawrence was included in the unknown male's DNA found in S.K.'s

vaginal samples. This meant that neither Lawrence nor any of his paternal male relatives could be eliminated as the source of the Y-STR DNA profile.

{¶ 40} Mother also testified at trial and indicated she and Lawrence dated for five years. While Mother testified Lawrence would physically abuse her on occasion, threatened to kill her, and frightened her, she indicated he had been a safe person around her children. Mother then described the night of the incident, and testified she picked Lawrence up from work and the two stopped at a bar before returning home. While at the bar, Mother had two or three beers and Lawrence had "quite a few" shots. Mother claimed she was sober, able to walk, and not crawling on the floor as S.K. testified. After leaving the bar, Mother and Lawrence got into an argument in the car, which continued when they arrived home. When they got into the bedroom, Lawrence grabbed Mother by the throat and bit her in the face. Ultimately, Lawrence let Mother go and she ran and hid in a closet. When she no longer heard Lawrence making noise, Mother left the closet and went down the steps. According to Mother, when she left the closet, she temporarily hid in the bathroom and went outside to smoke before falling asleep on the couch. Mother did not hear any commotion coming from the second floor of the home.

{¶ 41} The following morning, Mother observed that S.K. appeared nervous and timid. Lawrence told Mother he would take S.K. to school and when he returned, the two went to sleep in the bedroom. The next day, Father called Mother and informed her that S.K. said Lawrence had assaulted her. Mother confronted Lawrence and told him to get out of her house.

{¶ 42} The jury also heard testimony from B.H., S.K.'s close friend. B.H. testified that the morning after the alleged sexual assault, she woke up to five or six text messages from S.K. Each message was sent between 3:00 a.m. and 4:00 a.m. and stated: "Please

answer. Please answer. I need to talk to you" or "[B.H.] answer." B.H. believed that S.K. was in distress based upon these messages. Later that day, B.H. picked S.K. up from her classes and noticed S.K. had been crying and that she was limping and having trouble sitting down. The girls then went to B.H.'s house, where B.H. noticed S.K. was physically uncomfortable and very emotional. S.K. eventually began crying and told B.H. about the assault. In response, B.H. encouraged S.K. to tell Father. S.K. stayed at B.H.'s home that evening and spent the entire night crying. During that time B.H. observed large, dark, bruises on S.K.'s legs. The following morning, B.H. and S.K. went to Father's home and told him what had occurred.

{¶ 43} Father also testified at trial and indicated that in March 2016, S.K. was staying with Mother in order to attend her STNA classes. At that time, Mother was living with her mother and stepfather. Father described Mother's mother as five feet tall and 100 pounds, and Mother's stepfather as sick and frail. Father indicated he saw S.K. on the morning of March 17, 2016, the day after the alleged rapes, and noticed that S.K. was nervous and upset. Father left for work but continued communicating with S.K. and B.H. because he was worried about S.K. B.H. ultimately informed Father that Lawrence hurt S.K. At that point, Father left work early and took S.K. to the hospital in Hamilton. Thereafter, Father took S.K. to meet with the police. After giving a statement to the police, Father took S.K. to Children's Hospital.

{¶ 44} The jury then heard testimony from Detective Gleason with the Hamilton police department, who was one of the detectives who investigated S.K.'s case. Detective Gleason testified that he was called in for a sexual assault on March 17, 2016, and spoke with S.K., Father, and B.H. that evening. The detective described S.K. as visibly shaking, very closed off during her interview, and that "you could tell she'd been crying." According

to the detective, S.K. was not very forthcoming with answers to his questions and appeared uncomfortable speaking with him in the room. After receiving S.K.'s statement, Detective Gleason attempted to contact Lawrence "to get his side of the story." The detective called Lawrence several times and left messages. A few days later, Lawrence called the detective regarding the allegations and indicated he was suicidal and did not want to live anymore. Lawrence continued to deny the allegations and stated he planned to come to the station to speak with the detective the next day. Lawrence did not show up or call the following day. Accordingly, Detective Gleason began searching for Lawrence, including contacting his work and family members, driving by various addresses where Lawrence may have been staying, and calling his cell phone. Approximately six months later, in October 2016, Detective Gleason located Lawrence in Oxford after obtaining a search warrant to track Lawrence's phone. Lawrence was arrested that day pursuant to a warrant for domestic violence.

{¶ 45} The defense then presented testimony from Lawrence, who described himself as six feet tall, 215 pounds, and testified that he dated Mother for five years. During that time, he would drive Mother's children to various practices, attend school events, take them to work, and pick them up from events on occasion. Lawrence then detailed his version of March 15 and 16 of 2016. According to Lawrence, after his shift ended at 10:30 p.m. he met Mother at the bar. While at the bar, he and Mother got into an argument regarding Father. The couple then got into the car and the verbal altercation turned physical. Eventually, Mother jumped out of the car and proceeded to walk home. When Lawrence arrived home, S.K. was in the bedroom on the futon and Mother had not yet arrived. Lawrence testified he was upset and crying over the argument and S.K. consoled him by rubbing his back and giving him a hug. At one point, Lawrence claimed S.K. sat on his leg,

which he considered inappropriate, and prompted him to get a change of clothes and go downstairs. Lawrence then changed in the bathroom downstairs, ate a plate of food, and went to sleep. The following morning, Lawrence took S.K. to her classes and engaged in regular conversation with S.K.

{¶ 46} The next day, March 17, 2016, Lawrence learned that S.K. had accused him of raping her. A few days later, Detective Gleason contacted Lawrence. At that point, Lawrence contacted an attorney who indicated "it probably [wasn't] wise to turn [himself] in, if [he] didn't have the proper money to obtain the attorney." As a result, Lawrence did not turn himself in or respond to the detective's calls.

{¶ 47} Throughout his testimony, Lawrence denied engaging in any sexual conduct with S.K. and claimed that her testimony was untrue. According to Lawrence, he and S.K. had a "pretty decent" relationship and he would never do what she claimed he did.

{¶ 48} On appeal, Lawrence initially argues his rape convictions are against the manifest weight of the evidence because the testimony of S.K. and Mother was "rife with inconsistencies," and Lawrence was convicted "largely on" their testimony. Specifically, Lawrence points to three instances where Mother's and S.K.'s testimonies were inconsistent: (1) whether Mother motioned at S.K. while in the closet; (2) whether Mother was "sloppy drunk;" and (3) whether S.K. originally fell asleep on the futon or the bed.

{¶ 49} As an initial note, it is well settled that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "A defendant is not entitled to reversal of a conviction on manifest weight of the evidence grounds merely because inconsistent testimony was heard at trial." *State v. Glenn*, 12th Dist. Butler No. CA2009-01-008, 2009-Ohio-6549, ¶ 28, citing *State v. Day*, 10th Dist. Franklin No. 04AP-332, 2005-

Ohio-359, ¶ 17. Moreover, because the jury is the "sole judge of the weight of the evidence and the credibility of witnesses * * * [i]t may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *Id.*, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Accordingly, we find the jury was free to accept or reject any inconsistencies present in the testimony provided at trial.

{¶ 50} Furthermore, given the substantial testimony regarding the events of March 15, 16, and 17, which we note largely corroborates S.K.'s testimony, we do not agree that these inconsequential discrepancies "cast serious doubt on the foundation[s] upon which" Lawrence's rape convictions are based. Rather, we find that the jury heard significant testimony regarding the alleged rapes, which if believed, established Lawrence was guilty of the offenses. Specifically, S.K. testified in detail regarding the assault, including that Lawrence forced her to engage in vaginal intercourse three times and forcibly engaged in oral sex and digital penetration with her on the night in question. This was corroborated by the testimony of the SANE nurse, who indicated S.K. had bruising on her inner thighs and arms, as well as recent injury to her hymen, an abrasion on her vagina, and redness, pain, and discomfort which was abnormal for a clinical exam. Additionally, unknown-male DNA was detected in S.K.'s vaginal samples, which Lawrence could not be excluded from. Thus, despite the minor inconsistencies in Mother's and S.K.'s testimonies, the evidence is such that we do not find that the jury clearly lost its way and created a manifest miscarriage of justice finding Lawrence guilty of the rapes that occurred on the night in question.

{¶ 51} We also reject Lawrence's argument that his rape convictions were against the manifest weight of the evidence because the "State's narrative" defies logic, while Lawrence's account of events is "entirely logical." Specifically, we are unpersuaded by Lawrence's claim that it is "unbelievable" that S.K. never called 911 or alerted her

grandparents of the assault, despite having access to her cell phone and temporarily going downstairs. The record reflects that S.K.'s grandmother was described as five feet tall and 100 pounds, and her grandmother's husband was described as sick and frail. At the time of the incident, Lawrence was 215 pounds and six feet tall. The record also indicates that S.K. was afraid of Lawrence and what he would do to Mother or her sister if she disclosed what happened. We find S.K.'s fear to be substantiated, as S.K. observed Lawrence choke Mother the night of the incident and Mother testified Lawrence frequently threatened to kill her and engaged in physical violence and verbal altercations with Mother in front of the kids. Furthermore, S.K. texted her friend, B.H., several times the night of the assault. While the text messages did not fully disclose what was occurring, B.H. could discern that S.K. was in distress. In light of the evidence regarding S.K.'s fear of Lawrence, his history of violence in the home against her mother, and the physical condition of S.K.'s grandparents, we find that the jury could have reasonably believed that S.K. was justified in failing to seek help during the assault.

{¶ 52} Furthermore, while Lawrence argues his version of the evening is more plausible, that is, that he did not rape S.K. and he simply went to sleep on the night in question, a verdict is not against the manifest weight because the jury chose to disbelieve the defense theory and instead believe the state's version. See *State v. Anglin*, 12th Dist. Butler No. CA2018-03-058, 2019-Ohio-588, ¶ 30. Moreover, the record contains ample evidence that S.K. had been sexually assaulted and that Lawrence was the culprit. As such, we find the trier of fact did not clearly lose its way and create such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

{¶ 53} Therefore, Lawrence's third assignment of error is overruled.

{¶ 54} Assignment of Error No. 4:

{¶ 55} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT SENTENCED APPELLANT TO THREE CONSECUTIVE NINE YEAR PRISON TERMS.

{¶ 56} In his final assignment of error, Lawrence argues the trial court erred in sentencing him to three consecutive nine-year prison terms based upon his lack of genuine remorse. Specifically, Lawrence contends it was improper for the trial court to consider his lack of remorse as he had a direct appeal pending at the time of his resentencing, and he continued to maintain his innocence.

{¶ 57} As an initial note, Lawrence concedes that we no longer review an imposed sentence under an abuse of discretion standard. Instead, we review the imposed sentence under the standard of review set forth in R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1; *State v. Crawford*, 12th Dist. Clermont No. CA2012-12-088, 2013-Ohio-3315, ¶ 6. Pursuant to that statute, an appellate court does not review the sentencing court's decision for an abuse of discretion. *Marcum* at ¶ 10. Rather, R.C. 2953.08(G)(2) compels an appellate court to modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that "the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Id.* at ¶ 1. A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Ahlers*, 12th Dist. Butler No. CA2015-06-100, 2016-Ohio-2890, ¶ 8; *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8. The factors set forth in R.C. 2929.12 are nonexclusive, and R.C. 2929.12 explicitly allows a trial court to consider any relevant factors in imposing a sentence. *State v. Littleton*, 12th Dist. Butler No. CA2016-03-060, 2016-Ohio-7544, ¶ 12.

{¶ 58} In the instant matter, the trial court stated in its sentencing entry and at the resentencing hearing that it had considered the seriousness and recidivism factors set forth in R.C. 2929.11 and 2929.12. Upon consideration, the trial court found that certain facts made Lawrence's charges more serious for sentencing purposes. Specifically, the trial court noted that S.K. suffered serious psychological harm and that Lawrence's relationship with S.K. facilitated this offense. The trial court also commented that S.K. was a minor at the time the incident occurred, and at that time, Lawrence was in a position of trust in S.K.'s life and he was a person that she looked up to as a father. The trial court further found that certain factors showed Lawrence's potential for recidivism was more likely, including his history of criminal convictions. While there are no prior felonies, the court commented that Lawrence has had criminal convictions in the past. The court also discussed Lawrence's pattern of alcohol use, which the court considered related to this offense. It indicated that it was "not absolutely convinced that [Lawrence] acknowledges [the pattern of alcohol use] to the extent that [it] played a part in this." The court went on to state the following to Lawrence: "Alcohol has been a driving factor in your conduct from breakups in relationships and marriages to losing custody of your child. You apparently recognize that in your letters, but you don't do anything about it. And on this night in question, you ended up with [Mother] in a bar, you get in an argument with her, you commit a domestic violence incident in regard to her, and then you go home and you rape this child."

{¶ 59} The trial court also found that Lawrence's lack of genuine remorse was a factor that indicated Lawrence was likely to commit future crimes. Regarding that factor, the trial court stated: "I do find that based upon the statutory fact - - I know [counsel] touched on it, but he doesn't, in my opinion, show any remorse over what happened here." The court then addressed the letter submitted to the court by Lawrence, in which the court stated

Lawrence only discussed "what has happened to [him] throughout [his] life and how sorry [he is] for the pain that what [he has] done has inflicted upon [his family]." The trial court then noted that, despite the remorse shown to his family for his actions, Lawrence failed to express any remorse or apologize for any of the emotional or physical pain that he inflicted upon S.K.

{¶ 60} The trial court also discussed Lawrence's claim of innocence, and his contention that S.K. was lying or made the story up due to Lawrence's argument with her mother. In doing so, the trial court stated it was unsure how S.K. suffered "bruising on her arms and bruising on her legs and a torn hymen and an abrasion at the bottom entrance to her vagina" if the incident did not occur. The trial court also noted that it was unsure why Lawrence would text S.K. the following day apologizing if he did not believe he had done anything wrong.

{¶ 61} The trial court concluded by stating that Lawrence had not shown any remorse or contrition, nor had he accepted any responsibility in regard to what happened on the night in question. While Lawrence may have expressed some regrets at the resentencing hearing, the trial court did not believe he had "the right regrets."

{¶ 62} Lawrence does not dispute that the trial court sentenced him within the statutory range, nor does he dispute that the trial court properly applied postrelease control in this case. Rather, Lawrence argues the trial court erred in considering "improper factors" pursuant to R.C. 2929.12, as the court gave significant weight to his lack of remorse but failed to consider that Lawrence had a pending direct appeal and maintained his innocence.

{¶ 63} After reviewing the record, we find no error in the weight afforded to the factors of R.C. 2929.12, nor do we find any error in the trial court's consideration of Lawrence's lack of genuine remorse. Pursuant to R.C. 2929.12(D)(5), a trial court may consider

whether the offender "shows no genuine remorse for the offense." See also *State v. Nutter*, 3d Dist. Wyandot No. 16-01-06, 2001 Ohio App. Lexis 3752, *4 ("Pursuant to R.C. 2929.12[D][5], a defendant's lack of genuine remorse is a factor that indicates a likelihood that he or she will commit future crimes, while R.C. 2929.12[E][5] deems an expression of genuine remorse as a factor indicating that recidivism is not likely."). Additionally, this court has held that it is not improper for the trial court to consider a defendant's failure to show any remorse or take any responsibility for his actions at the sentencing hearing, even in cases where the defendant maintained the position that "he didn't do this" at trial. *State v. Davis*, 12th Dist. Clermont No. CA2000-09-073, 2001 Ohio App. LEXIS 1641, *7-8 (Apr. 9, 2001). Other Ohio appellate courts agree, and have expressly found that a defendant's lack of genuine remorse is an appropriate consideration for sentencing, even for a convicted defendant who maintains his innocence. *State v. Williams*, 10th Dist. Franklin No. 15AP-48, 2016-Ohio-4550, ¶ 88; *State v. Roseberry*, 7th Dist. Belmont No. 11 BE 21, 2012-Ohio-4115, ¶ 8; *State v. Black*, 4th Dist. Ross No. 12CA3327, 2013-Ohio-2105, ¶ 64; *State v. Caver*, 8th Dist. Cuyahoga No. 91443, 2009-Ohio-1272, ¶ 122, fn 11, quoting *State v. Farley*, 2d Dist. Miami No. 2002-CA-2, 2002-Ohio-6192, ¶ 54; *State v. Brown*, 3d Dist. Allen No. 1-10-31, 2011-Ohio-1461, ¶ 51. As such, despite Lawrence's claims of innocence at the time of the resentencing hearing and his pending direct appeal claiming the same, we find the trial court did not err in considering Lawrence's lack of genuine remorse in accordance with R.C. 2929.12(D)(5).

{¶ 64} Further, although Lawrence contends the trial court focused primarily upon his lack of remorse, the record reflects the trial court gave weight to several factors set forth in R.C. 2929.12 when determining his sentence. These factors include Lawrence's relationship with S.K. and status as a father figure in her life, Lawrence's expression of

remorse to his family, Lawrence's history of alcohol abuse which has gone unacknowledged by Lawrence and gave rise to the incident in question, Lawrence's history of criminal convictions, and lastly, that S.K. suffered serious psychological harm as a result of the incident.  After a review of the record, we find no error in the weight the trial court afforded to these factors.  Notably, it is "[t]he trial court [that], in imposing a sentence, determines the weight afforded to any particular statutory factors, mitigating grounds, or other relevant circumstances." *State v. Steger*, 12th Dist. Butler No. CA2016-03-059, 2016-Ohio-7908, ¶ 18, citing *State v. Stubbs*, 10th Dist. Franklin No. 13AP-810, 2014-Ohio-3696, ¶ 16.

{¶ 65} As a result, we find Lawrence's sentence is not clearly and convincingly contrary to law.  The court properly considered the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, informed Lawrence he would be placed on mandatory postrelease control for a period of five years upon his release from prison, and sentenced Lawrence within the permissible statutory range for his first-degree felonies in accordance with R.C. 2929.14(A)(1).

{¶ 66} Accordingly, Lawrence's fourth assignment of error is overruled.

{¶ 67} Judgment affirmed.

RINGLAND and PIPER, J., concur.