[Cite as *State v. Jones*, 2021-Ohio-4117.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-04-038 |
| | : | O P I N I O N |
| - vs - | | 11/22/2021 |
| | : | |
| LENNIE A. JONES, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CR36403

David P. Fornshell, Warren County Prosecuting Attorney, and Kathryn M. Horvath, Assistant Prosecuting Attorney, for appellee.

William F. Oswall, Jr., for appellant.

**S. POWELL, J.**

{¶ 1} Appellant, Lennie A. Jones, appeals his conviction in the Warren County Court of Common Pleas after a jury found him not guilty of first-degree felony rape, but guilty of the lesser-included offense of third-degree felony sexual battery. For the reasons outlined below, we affirm in part, reverse in part, and remand for the limited purpose of

resentencing.

{¶ 2}   On January 24, 2020, the Warren County Grand Jury returned an indictment charging Jones with one count of rape in violation of R.C. 2907.02(A)(1)(a), a first-degree felony in accordance with R.C. 2907.02(B).  Pursuant to those statutes, "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender" when, for the purpose of preventing resistance, "the offender substantially impairs the other person's judgment or control by administering any drug, intoxicant, or controlled substance to the other person surreptitiously or by force, threat of force, or deception."

{¶ 3}   The charge arose after it was alleged Jones drugged the then 24-year-old victim, K.B., with the sleep aid Trazodone prior to vaginally raping K.B. on the evening of March 18, 2019 while the two were in a barn located on Jones' property in Clearcreek Township, Warren County, Ohio.  Jones entered a not guilty plea at his arraignment hearing held on January 29, 2020.  The matter ultimately proceeded to a two-day jury trial held on March 1 and 2, 2021.  During trial, the jury heard testimony from a total of eight witnesses. This includes testimony from both Jones and K.B., as well as from Joanne Spicer, the sexual assault nurse examiner ("SANE") who examined K.B. at the hospital shortly after the alleged rape occurred.  The following is a summary of the testimony elicited from Jones and K.B. at that two-day jury trial.

*K.B.'s Trial Testimony*

{¶ 4}   K.B. testified that she and her four-year old daughter drove to Jones' property in Clearcreek Township at approximately 2:30 p.m. on the afternoon of March 18, 2019. K.B. testified that she went to Jones' property in order to pick up $200 she had loaned to Jones three or four months earlier so that Jones and Jones' wife, Diane, could travel to Indiana for their son's wedding.  K.B. testified that upon arriving at Jones' property that she parked outside Jones' barn in an area located approximately 100 yards behind Jones'

house. Describing Jones' barn further, K.B. testified that the barn was "the hang out spot" that was "kind of like a mini house" that had "a couch, recliners, TV, two cars, a refrigerator, [and] a kitchen table," that was "right next to his pond where we fished."

{¶ 5} K.B. testified that after she parked, she and her daughter went inside the barn where she contacted Jones and asked if he had her $200. K.B. testified that Jones responded and told her that "he needed to go to the ATM to get it still." K.B. testified that this "annoyed" her because she thought Jones "had already had the money on him." K.B. testified that this also annoyed her because Jones did not have a vehicle, which meant she was going to have to drive Jones to the ATM herself. K.B. testified that this also "frustrated" her because Jones "talks a lot, so [she] knew [she] was going to be there a lot longer than [she] wanted to be there." Ready to take Jones to the ATM, K.B. testified that Jones told her to wait so that he could "smoke half a joint" before they left. K.B. testified that this frustrated her even further because she figured it was going to take "a while" for Jones to finish smoking his joint.

{¶ 6} K.B. testified that Jones then offered her a "shot of vodka," which she accepted. K.B. testified that she did not see Jones retrieve the vodka drink for her. K.B. testified that she also did not see Jones pour the vodka drink into the plastic cup that she ultimately drank from. K.B. nevertheless testified that after finishing her first vodka drink that Jones gave her a second vodka drink in the same plastic cup. K.B. testified that Jones brought her the second vodka drink somewhere between 60 and 90 minutes after she and her daughter had first arrived at Jones' property. Just like her first vodka drink, K.B. testified that she did not see Jones pour her second vodka drink either because "[t]he fridge is too far" and because there were items in the barn that were blocking her view. Despite this, K.B. testified that she believed there were "[m]aybe" two shots of vodka in each of the two vodka drinks provided to her by Jones.

{¶ 7} K.B. testified that while she was drinking her two vodka drinks, and Jones was smoking his joint, that she and Jones were sitting at a table having small talk about "what'd you do today or how the weather is. Just anything." K.B. testified the conversation with Jones never turned "flirty or sexual in nature" and that she was not in any way interested in having "some sort of sexual contact" with Jones. K.B. testified that this was because she viewed Jones more as a father figure. K.B. testified this was also because Jones was "a lot" older than her and because she grew up knowing Jones like a family member. K.B. testified that her relationship with Jones, who the record indicates was at that time in his late 50s, all started when she was a child and Jones was a neighbor and good friend of her father who would sometimes take care of her and get her and her brother on and off the school bus. K.B. testified that this ultimately resulted in her considering Jones to be a "family friend" who she would still visit once or twice a month. K.B. testified that these visits included her and Jones going fishing in his pond or just "hang[ing] out" in Jones' barn.

{¶ 8} K.B. testified that while sitting down at the table talking to Jones that she remembers looking up at the clock on the wall and seeing that it was 4:00 p.m. K.B. testified this was the last memory she had before waking up "at five in the morning on the couch," with her daughter sleeping by her side, and several blankets piled on top of her. K.B. testified that when she woke up that she felt "[n]ot good, dizzy," and woozy. K.B. also testified that upon waking up she realized that her underwear was pulled "halfway down [her] thighs," "[m]id-thigh," and that her pants were off and laying on the floor next to her. K.B. further testified that her vagina hurt, that there was "a little" blood in her underwear, and that the tampon she had been using the day before was no longer in place. The record indicates that K.B.'s tampon was subsequently located in a trash can in Jones' barn stuffed inside a McDonald's bag that was then shoved inside an empty case of Mountain Dew. When asked if she would ever just throw her tampon in the trash like this, K.B. testified,

- 4 -

"No." K.B. also testified that she never changed her tampon without having another tampon available.

{¶ 9} K.B. then testified that although she had pain emanating from her vagina that she nevertheless laid back down and went to sleep because she "didn't feel comfortable driving feeling that dizzy." K.B. testified that she then woke up a few hours later and drove from Jones' property with her daughter. K.B. testified that upon getting into the car she found a receipt from McDonald's that was date stamped from the day before at "03/18/19 05:23 PM." K.B. testified that she had no recollection of going to McDonald's or, for that matter, of anything else that may have happened after 4:00 p.m. the previous day. K.B. testified that she then called her boyfriend, M.G., because she was "just confused." K.B. testified that her boyfriend told her that she needed to go to the hospital "[t]o have a rape kit done." K.B. testified that she then drove from Jones' property to her boyfriend's house, dropped off her daughter with her boyfriend, and went to the hospital to be examined.

{¶ 10} K.B. testified that when she got to the hospital that her vagina still hurt and that swabs were taken from "[a]ll over" her body. The record indicates that this included swabs taken by Joanne Spicer, the SANE who examined K.B., from K.B.'s vagina and K.B.'s perianal and anal areas. K.B. testified that she also talked to police officers from the Clearcreek Township Police Department while at the hospital. K.B. testified that after speaking with these police officers, she left the hospital and went back to her boyfriend's house to retrieve her daughter. K.B. testified that after retrieving her daughter from her boyfriend's house that she then contacted Jones via Facebook messenger.

{¶ 11} K.B. testified that she decided to contact Jones "[t]o see if [she] could get more information" about what had happened the night before. K.B. testified that she did this because "[o]nce the police get there and do their search warrant, [Jones'] not going to tell [her] anything." K.B. testified that she also contacted Jones because she "still wanted

the $200" that Jones owed to her. K.B. testified that she first messaged Jones asking whether he had ever given her the $200 he owed to her. K.B. testified that the reason for asking Jones this question was because she did not "even remember if he gave [her] the $200 or not." K.B. testified that Jones responded, "No not yet. I'll go to the ATM." K.B. testified that she then told Jones that she needed $200 as soon as possible. To this, K.B. testified that Jones said, "Okay." K.B. testified that Jones then told her that he would let her know when he went to the ATM. K.B. testified that she then responded, "Ok thanks."

{¶ 12} K.B. testified that she contacted Jones again later that night when Jones had still not dropped off the $200 that he owed to her. Specifically, K.B. testified that she asked Jones, "are you going to bring that by soon?" K.B. testified that Jones responded and said:

> Hey I just went by your house a couple minutes ago [two Springboro] cops [were] sitting about five houses down. I don't know what's going on but I'd rather you come and get it or I'll meet you somewhere. I don't like going up to your house when nobody's there looks suspicious. But I've got the cash on me.

K.B. testified that she thought Jones' response seemed strange because she "didn't know why it mattered if cops were by [her] house." K.B. testified that Jones then asked her if she remembered that she was "acting a little crazy last night?" K.B. testified that Jones then said, "I'm giving you $20 extra for [doing] that."

{¶ 13} K.B. testified that she did not know what Jones meant by her "acting a little crazy" the night before. K.B. testified that Jones then told her that she was being "very rowdy," "honking the horn," and trying to get out of the car while in the McDonald's drive-thru because the people in front of them were taking "forever and forever." K.B. testified that she did not remember anything about this incident. K.B. testified that Jones then stated that she likely did not remember what happened because she "[p]robably * * * started drinking before you ate a fish sandwich." K.B. testified that she thought this was odd because she does not eat fish. K.B. testified that she then asked Jones why she did not

have her pants on when she woke up in his barn that morning. K.B. testified that Jones responded by claiming that she fell down while going to the bathroom and "came in after [peeing] that way."

{¶ 14} K.B. testified that she then asked Jones, "Oh did we do anything?" K.B. testified that Jones responded and stated, no, they did not. K.B. testified that she then told Jones, "I would like to know [because] I haven't been taking my birth control and I can get a free plan B pill from Drug Mart." K.B. testified that Jones then responded, "Nope we didn't and you have nothing to worry about. If something did I would tell you." K.B. testified that she then told Jones, "It just didn't make sense because I had a tampon in and when I woke up I didn't." K.B. testified that Jones then responded, "Ok then nice to know." K.B. testified that she then asked Jones, "Why was I so crazy last night?" To this, K.B. testified that Jones responded:

> I can say when we was at McDonald's drive-through if you would have got out of the car screaming and raising hell I told you I said Springboro cops will be here so I'll drag your ass back in saved you again * * *. The person in the drive-thru ordered like seems like 300 ice cream cones and we probably sat there for a good 20 minutes waiting.

{¶ 15} Concluding her testimony, K.B. then again testified that she did not remember anything that happened after 4:00 p.m. on the afternoon of March 18, 2019. K.B. also testified that consuming approximately four shots of vodka over a two hour period would not have caused her to black out because she considered herself to be an "alcoholic" at that time. K.B. additionally testified that she did not knowingly consume any drugs with Jones after driving to Jones' property that day. K.B. testified that this included the sleep aid Trazodone, the effects of which the record indicates can be accentuated by alcohol consumption.

{¶ 16} However, although K.B. testified that she had not knowingly consumed any

- 7 -

drugs with Jones, there is no dispute that a urine sample taken from K.B. on March 19, 2019, the day after the alleged rape occurred, tested positive for the sleep aid Trazodone. There is also no dispute that Jones is prescribed Trazodone, that Jones keeps Trazodone pills in his barn, and that an empty bottle of Trazodone prescribed to Jones was subsequently found in the trash can located in Jones' master bedroom. There is further no dispute that the swabs taken from K.B.'s perianal and anal areas during the examination conducted by Joanne Spicer, who, as noted above, was the SANE nurse who examined K.B. at the hospital, tested positive for Jones' semen.

*Jones' Trial Testimony*

{¶ 17} Jones testified that he first came in contact with the victim, K.B., when they were "neighbors years ago." Jones testified that during this time K.B. and one of his sons were in the same grade. Jones also testified that "at times" he had gotten K.B. and K.B.'s brother "off the bus with [his] son at the same time after school." Jones then testified that K.B. is no longer his neighbor because she moved, but that K.B. was a "friend" who would come over to visit him "an average two, three times a week." When asked why K.B. was coming to visit him, Jones testified that "[a] lot of times to fish because she liked fishing," as well as "just to hang out together to get away from her parents she said." Jones testified that when K.B. was at his property – more specifically, his barn – that he and K.B. would, "[m]ainly just talk and watch television." Jones also testified that he would smoke marijuana in K.B.'s presence and that K.B. would drink alcohol in his barn "because she wasn't allowed to drink at home."

{¶ 18} Jones testified that K.B. came to his property with her daughter somewhere between "three, 3:30" on the afternoon of March 18, 2019. Jones testified that once in his barn that K.B.'s daughter started watching television, whereas K.B. "got a drink of vodka." Jones later testified and explained that it was actually him, not K.B., who "poured [the vodka]

for her." Jones testified that this drink, one of the two vodka drinks that he admittedly made for K.B. that afternoon, contained maybe "a shot and a half" of vodka." Jones testified that the vodka he used for K.B.'s two vodka drinks came from the refrigerator that he had in his barn. When asked if he put "any pills" or "crush[ed] anything" into the two vodka drinks that he made for K.B. that day, Jones testified, "[a]bsolutely not."

{¶ 19} Jones then testified that while K.B. drank her two vodka drinks and he smoked a joint, K.B.'s daughter "kept on saying she was hungry" and that she "hasn't ate since yesterday." Jones testified that he then volunteered to drive K.B. and her daughter to McDonald's to get something to eat. Jones testified that he then drove K.B. and her daughter to McDonald's where he ordered K.B.'s daughter a Happy Meal. Jones testified that he drove to McDonald's somewhere between 5:00 p.m. and 5:30 p.m.. Jones then testified about what happened while in the McDonald's drive-thru as follows:

> Well, [K.B.] was really kind of fidgety and antsy and just being
> kind of like obnoxious because there was a car in front of us and
> it seemed like they dished out like five or six ice creams to kids.
> It took forever and she was blowing the horn and screaming.

{¶ 20} Jones also testified that K.B. "tried to get out of the car" so he "grabbed her arm" and "yanked her in" and warned her that "Springboro will arrest you in a minute." Jones testified that he believed K.B.'s behavior had nothing to do with her having just drank two vodka drinks, but was instead "her nature habit to get mad," that she can be a bit of a "hot head," and that "[s]he's got really a temper."

{¶ 21} Jones testified that he then drove K.B. and her daughter back to his barn where K.B.'s daughter ate her Happy Meal. Jones testified that K.B.'s daughter was at the time on the other side of the barn watching television. Jones testified that K.B. then "wanted more alcohol" so he gave her "another shot." Jones testified that after giving K.B. her third vodka drink that he "[p]robably" smoked some more marijuana. Jones testified that he and

K.B. then sat down at the table and began "talking about stuff" like "her life and how she says how she hates her life and all that."

{¶ 22} Jones testified that K.B. then asked him to massage her neck, to which Jones testified that he agreed. Jones testified that K.B. then said, "let's go over here and you finish doing it. I need to lay down." Jones testified that he again agreed and proceeded to massage K.B.'s neck while K.B.'s daughter was nearby watching cartoons on the television. Jones testified that he then stopped massaging K.B. while K.B. put her daughter to bed "[o]n the other side of like a couch by the entrance door." Jones testified that once K.B.'s daughter was asleep that he and K.B. then went and sat on a nearby futon and:

> continue to massage and kind of got – one thing led to another and the next thing I know she pulls her pants down. And she said she was on her period and, of course, we didn't do nothing. Didn't have sexual intercourse.

{¶ 23} Explaining this encounter further, Jones testified that he and K.B. were "of course kissing" and "next thing we know, you know, she had her pants down" and he was "dry humping" K.B.'s leg, "rubbing on her" with his pants "[s]omewhat" pulled down to his knees with his exposed penis "on her thigh.[1]" Jones then testified that, "No," he was not wearing any underwear "that night." Jones also testified that his penis was "never" inserted into either K.B.'s vagina or rectum and that his penis remained on the outside of K.B.'s body at "all times." Jones nevertheless testified that repeatedly pressing his exposed penis on K.B.'s body caused him to ejaculate on K.B.'s right thigh.

{¶ 24} Jones testified that after ejaculating, he "[g]ot up," "got dressed," exited the barn, and went into the house. Jones testified that he did this because his wife, Diane, was

---

1. We note that the transcript indicates that Jones said, "dry hunching" K.B.'s leg instead of "dry humping" K.B.'s leg. Jones' trial counsel later clarified that Jones was referring to the sexual act of "dry humping" when Jones used the term "dry hunching." The term "dry humping" is a slang term commonly used to describe the sex act of simulated sexual intercourse, either vaginal or anal, without penetration, where the participants are clothed.

at that time "on her way home from work" and she would not have approved of him sleeping in the barn with K.B. Jones testified that this all occurred around "6:30ish, maybe 7:30, somewhere in there." Jones also testified that, as far as he was aware, his ejaculate was never cleaned up after his sexual encounter with K.B. concluded.

{¶ 25} When asked if he had any reason to believe that K.B. was too intoxicated to remember anything that happened between them on the evening of March 18, 2019, Jones testified, "No." Jones also testified "No, she did not," when asked whether K.B. ever appeared too intoxicated to consent to having sexual relations with him that evening. Jones further testified and explicitly denied raping K.B. that evening. Jones also denied ever ejaculating inside of K.B.'s vagina or rectum. Jones later testified that he was, in fact, "[o]ne hundred and ten percent" sure that although he ejaculated onto K.B.'s right thigh that his penis never went inside either K.B.'s vagina or rectum.

{¶ 26} After both parties rested, the trial court granted the state's motion to instruct the jury on sexual battery in violation of R.C. 2907.03(A)(2) as a lesser included offense of rape in violation of R.C. 2907.02(A)(1)(a). The trial court then provided the jury with final jury instructions and released the jury for deliberations. Following deliberations, the jury returned a verdict finding Jones not guilty of rape in violation of R.C. 2907.02(A)(1)(a), but guilty of the lesser included offense of sexual battery in violation of R.C. 2907.03(A)(2).

{¶ 27} On April 12, 2021, the trial court held a sentencing hearing. During this hearing, the record indicates the trial court was under the mistaken belief that R.C. 2929.13(F)(3)(c)(ii) applied to the case at bar, thereby requiring it to sentence Jones to a mandatory prison term. Specifically, as the trial court stated, "it's mandatory prison time in this case. I have to sentence you to prison. I'm not apologizing for it, I'm just telling you that basically that's what the law is." The trial court then sentenced Jones to serve a mandatory 18-month prison term. The trial court also classified Jones as a Tier III sex

offender and notified Jones that he would be subject to a mandatory five-year postrelease control term.

{¶ 28} Jones now appeals his conviction, raising six assignments of error for review. For ease of discussion, we will address Jones' first assignment of error out of order.

{¶ 29} Assignment of Error No. 2:

{¶ 30} THE TRIAL COURT ERRED IN INSTRUCTING THE JURY OF THE CHARGE OF SEXUAL BATTERY.

{¶ 31} In his second assignment of error, Jones argues the trial court erred by instructing the jury on sexual battery in violation of R.C. 2907.03(A)(2) as a lesser included offense of rape in violation of R.C. 2907.02(A)(1)(a). This is because, according to Jones, sexual battery in violation of R.C. 2907.03(A)(2) is not a lesser included offense of rape in violation of R.C. 2907.02(A)(1)(a). However, the Seventh District Court of Appeals has already determined that sexual battery in violation of R.C. 2907.03(A)(2) is, in fact, a lesser included offense of rape in violation of R.C. 2907.02(A)(1)(a). *See State v. Eberth*, 7th Dist. Mahoning No. 07-MA-196, 2008-Ohio-6596, ¶ 26 ("sexual battery under R.C. 2907.03[A][2] is a lesser included offense of rape under R.C. 2907.02[A][1][a]"), discretionary appeal not allowed, 121 Ohio St.3d 1453, 2009-Ohio-1820; *see also State v. Kuck,* 2d Dist. Darke No. 2015-CA-13, 2016-Ohio-8512, ¶ 62-67 (trial court did not commit plain error by instructing the jury on sexual battery in violation of R.C. 2907.03[A][2] as a lesser included offense of rape in violation of R.C. 2907.02[A][1][c], a similarly worded statute to the offense of rape in violation of R.C. 2907.02[A][1][a]), discretionary appeal not allowed, 150 Ohio St.3d 1444, 2017-Ohio-7843. We agree. Therefore, because we find no error in the trial court instructing the jury on sexual battery in violation of R.C. 2907.03(A)(2) as a lesser included offense of rape in violation of R.C. 2907.02(A)(1)(a), Jones' second assignment of error lacks merit and is overruled.

{¶ 32} Assignment of Error No. 3:

{¶ 33} JONES'S CONVICTION MUST BE REVERSED AS A RESULT OF THE PROSECUTOR'S INAPPROPRIATE USE OF HIS PRE-MIRANDA SILENCE.

{¶ 34} In his third assignment of error, Jones argues his conviction must be reversed given the state's "inappropriate" use of his so-called "pre-arrest, pre-*Miranda* silence" when the state asked him "why he didn't ask the police officers who conducted the search warrant on his property as to why they were present" as part of the state's cross-examination. It is generally well-established that "the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *State v. Jozwiak*, 12th Dist. Warren No. CA2019-09-091, 2020-Ohio-3694, ¶ 34. However, as the record indicates, the state's questioning Jones about his prearrest, pre-*Miranda* silence was not used as substantive evidence indicative of Jones' guilt. The state's questioning was instead used to impeach Jones' testimony that he was "[k]ind of" surprised when the police arrived at his home with a search warrant the day after the alleged rape occurred. Therefore, despite Jones' claim, the effect of the state's questioning Jones in this manner was proper given that it was for impeachment purposes only, and not to portray Jones' so-called prearrest, pre-Miranda silence as substantive evidence indicative of Jones' guilt.

{¶ 35} In so holding, we note that "[t]he United States Supreme Court [has] held that the use of pre-arrest, pre-*Miranda* silence to *impeach* a criminal defendant does not violate the Fifth Amendment right to be free from self-incrimination, nor the Fourteenth Amendment right to due process." (Emphasis sic.) *State v. Feerer*, 12th Dist. Warren No. CA2008-05-064, 2008-Ohio-6766, ¶ 16, citing *Jenkins v. Anderson*, 447 U.S. 231, 238, 240, 100 S.Ct. 2124 (1980). The Ohio Supreme Court has similarly held that "pre-*Miranda* silence may be used for impeachment purposes if the defendant testifies at trial." *State v. Myers*, 12th Dist. Madison No. CA2019-01-003, 2020-Ohio-59, ¶ 29, citing *State v. Leach*, 102 Ohio St.3d

135, 2004-Ohio-2147, ¶ 21-23.  Such is the case here.  To hold otherwise, thereby finding it was error for the state to question Jones about his prearrest, pre-*Miranda* silence as part of the state's cross-examination, "would vitiate the truth-seeking process and otherwise insulate [Jones] from cross-examination, which is the test of credibility."  *State v. Haddix*, 12th Dist. Warren No. CA2011-07-075, 2012-Ohio-2687, ¶ 29, discretionary appeal not allowed, 133 Ohio St.3d 1425, 2012-Ohio-4902.  Therefore, because we find no merit to any of the arguments raised by Jones herein, Jones' third assignment of error lacks merit and is overruled.

{¶ 36}  Assignment of Error No. 4:

{¶ 37}  THE TRIAL COURT ERRED IN PERMITTING EXPERT TESTIMONY FROM THE SANE NURSE.

{¶ 38}  In his fourth assignment of error, Jones argues the trial court erred by permitting Joanne Spicer, the SANE nurse who conducted an examination of K.B. at the hospital shortly after the alleged rape occurred, to testify about the reason why she took perianal and anal swabs from K.B. as part of her examination "even though the allegation was vaginal rape" and not anal rape.  Specifically, Jones challenges the admissibility of Spicer's testimony that "fluids roll down," and that "if you consider gravity, even if a person is laying on their back and there's vaginal penetration and there's ejaculate, gravity is going to pull that down so you're still going to do the anal."

{¶ 39}  To support this claim, Jones argues that Spicer's testimony about the impact that gravity may have on semen, a liquid, was inadmissible because the state did not comply with Crim.R. 16(K).  Pursuant to that rule, all expert witnesses are required to "prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications."  Therefore, according to Jones, because the state did not comply with Crim.R. 16(K), Spicer's testimony set forth

above was inadmissible because it went "beyond the scope" of what was permissible expert witness testimony.

{¶ 40} However, despite Jones' claim, the record plainly reveals that Spicer did not testify as an expert witness under Evid.R. 702. The record instead firmly establishes that Spicer testified as a lay witness in accordance with Evid.R. 701. "[A] 'lay witness' is defined as one who does not testify as an expert and is restricted to 'giving an opinion or making an inference that (1) is based on firsthand knowledge, and (2) is helpful in clarifying the testimony or in determining facts.'" *State v. Fread*, 12th Dist. Butler No. CA2013-03-045, 2013-Ohio-5206, ¶ 14, quoting Black's Law Dictionary (8th Ed.2004) 1633. It is well-established that "Crim.R. 16(K) only requires a summary of the expert opinion." *State v. Partin*, 12th Dist. Butler No. CA2019-05-079, 2020-Ohio-4624, ¶ 62, discretionary appeal not allowed, 161 Ohio St.3d 1410, 2021-Ohio-106. Therefore, because Crim.R. 16(K) was inapplicable to Spicer's lay witness testimony, the trial court did not err by permitting Spicer to testify about the reason why she took perianal and anal swabs from K.B. as part of her examination "even though the allegation was vaginal rape" and not anal rape.

{¶ 41} In so holding, we note that contrary to Jones' claim, it does not take any specialized knowledge, skill, experience, training, or education to understand that gravity could cause semen, a liquid, to roll down from a victim's vagina to a victim's rectum (or vice-versa), thereby necessitating swabs be taken from both areas of the alleged victim's body regardless of whether the allegation was one of vaginal rape or of anal rape. That gravity may cause a liquid, like semen, to move or be transferred from one part of the body to another is an observable fact that is a matter of common knowledge. *See State v. Warren*, 11th Dist. Trumbull No. 2010-T-0027, 2011-Ohio-4886, ¶ 53 ("[a]n average juror is aware that liquids, regardless of their viscosity, will move or transfer when subjected to a given force, such as gravity or friction. This is not a theory, but an observable fact common to

everyone's experience"), discretionary appeal not allowed, 131 Ohio St.3d 1457, 2012-Ohio-648; *see also Crane v. Brintnall*, 29 Ohio Misc. 75, 84, 1972 Ohio Misc. LEXIS 204 (Jan. 6, 1972) (C.P.) ("the operation of the law of gravity and the fact that water will seek its lowest level is a matter of common knowledge"). Therefore, finding no merit to any of the arguments raised by Jones herein, Jones' fourth assignment of error lacks merit and is overruled.

{¶ 42} Assignment of Error No. 5:

{¶ 43} THE CONVICTION MUST BE REVERSED AS THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

{¶ 44} In his fifth assignment of error, Jones argues his conviction was not supported by sufficient evidence. We disagree.

*Sufficient Evidence Standard of Review*

{¶ 45} Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). "When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Tenbrook*, 12th Dist. Butler No. CA2020-01-005, 2020-Ohio-5227, ¶ 9, citing *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. "The relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Moore*, 12th Dist. Fayette No. CA2020-09-016, 2021-Ohio-1856, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing

*State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33. "[A] reversal based on insufficient evidence leads to an acquittal that bars a retrial." *State v. Gideon*, Slip Opinion No. 2020-Ohio-6961, ¶ 27.

*Elements of Sexual Battery in Violation of R.C. 2907.03(A)(2)*

{¶ 46} As noted above, Jones was convicted of third-degree felony sexual battery in violation of R.C. 2907.03(A)(2). Pursuant to that statute, "[n]o person shall engage in sexual conduct with another, not the spouse of the offender" when "[t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." The Ohio Revised Code defines the term "sexual conduct" to encompass a variety of acts of a sexual nature. *State v. Kuhn*, 2d Dist. Montgomery No. 20912, 2005-Ohio-6836, ¶ 37. This includes "vaginal intercourse" between persons of the opposite sex, as well as "anal intercourse" between persons regardless of sex. R.C. 2907.01(A). This also includes "the insertion, however slight, of any part of the body or any instrument, apparatus or other object into the vaginal or anal opening of another" without the privilege to do so. *Id.* Penetration, however slight, is "sufficient to complete vaginal or anal intercourse." *Id.*

{¶ 47} Under R.C. 2901.22(B), a person acts knowingly when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." In other words, "[t]o act knowingly, a defendant merely has to be aware that the result may occur." *State v. Wilson*, 12th Dist. Warren No. CA2018-03-022, 2019-Ohio-338, ¶ 46. "Absent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself." *State v. Hilton*, 12th Dist. Butler No. CA2015-03-064, 2015-Ohio-5198, ¶ 20, citing *State v. Robinson*, 12th Dist. Fayette No. CA2005-11-029, 2007-Ohio-354, ¶ 18; *State v. Logan*, 60 Ohio St.2d 126,

131 (1979) (a defendant's mental state may be "inferred from the surrounding circumstances"). This is because "'the intent of an accused person is only in his mind and is not ascertainable by another * * *.'" *State v. Blanton*, 12th Dist. Madison No. CA2005-04-016, 2006-Ohio-1785, ¶ 22, quoting *State v. Huff*, 145 Ohio App.3d 555, 563 (1st Dist.2001).

{¶ 48} The phrase "substantially impaired" is not defined by the Ohio Revised Code. *State v. Kilbarger*, 12th Dist. Fayette No. CA2013-04-013, 2014-Ohio-2341, ¶ 10. The Ohio Supreme Court, however, "has held that 'substantial impairment' must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of her conduct or to control her conduct." *State v. Anglin*, 12th Dist. Butler No. CA2018-03-058, 2019-Ohio-588, ¶ 16, citing *State v. Zeh*, 31 Ohio St.3d 99, 103-104 (1987). "Substantial impairment may be proven by the victim's own testimony." *Id.* at ¶ 17. Substantial impairment may also be proven "by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." *State v. Z.G.B.*, 12th Dist. Warren No. CA2016-04-029, 2016-Ohio-7195, ¶ 15. "'A substantial-impairment determination is made on a case-by-case basis, with great deference to the factfinder.'" *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 16, quoting *Kilbarger* at ¶ 11.

*Sufficient Evidence of Sexual Conduct*

{¶ 49} Jones initially argues the state failed to prove he engaged in sexual conduct with K.B. because there was "no evidence of actual penetration." However, when viewing the evidence in a light most favorable to the state, we find there was sufficient evidence, albeit circumstantial, to prove that penetration, however slight, did occur so as to support Jones' conviction. This includes, most notably, K.B.'s testimony that she felt pain emanating from her vagina upon waking up in Jones' barn with her pants off and her underwear pulled

down to her knees after having unwittingly engaged in a sexual encounter with Jones the prior evening. This also includes the evidence that K.B.'s tampon was removed from K.B.'s body and disposed of in such a manner that K.B. testified was inconsistent with when and how she removes and disposes of her tampons, as well as the presence of Jones' semen on the swabs taken from K.B.'s perianal and anal areas. This is in addition to the evidence that during the sexual encounter between K.B. and Jones that Jones was, at the very least, rubbing his exposed penis against K.B.'s body in an area near K.B.'s vagina and rectum with such ferocity that it caused Jones to ejaculate.

{¶ 50} In reaching this decision, we note the well-established principle that "[f]acts may be proved by circumstantial evidence as well as direct evidence or any combination and both types of evidence have equal probative value." *State v. Rose*, 12th Dist. Madison No. CA84-93-912, 1985 Ohio App. LEXIS 9051, *13-14 (Oct. 28, 1985). We also note that, given the jury's verdict, the jury clearly found Jones' testimony that he was "[o]ne hundred and ten percent" sure that his penis never penetrated either K.B.'s vagina or rectum lacked credibility. It is the trier of fact, and not this court on appeal, that makes determinations of credibility. *State v. Baker*, 12th Dist. Butler No. CA2019-08-146, 2020-Ohio-2882, ¶ 31. That Jones' testimony contradicted the evidence offered by the state indicating penetration occurred does not mean the jury's verdict was based on insufficient evidence. *Kaufhold*, 2020-Ohio-3835 at ¶ 34. Therefore, because we find the state presented sufficient evidence to prove Jones engaged in sexual conduct with K.B., Jones' first argument lacks merit

*Sufficient Evidence of Knowledge of Substantial Impairment*

{¶ 51} Jones also argues the state failed to prove that he "knew of the alleged victim's substantial impairment, assuming that there even was impairment." However, when again viewing the evidence in a light most favorable to the state, the record indicates

that Jones knowingly provided K.B. with the sleep aid Trazodone, for which he has a prescription, in at least one, if not both, of the two vodka drinks Jones provided to K.B. The record also indicates that K.B. was unaware that the two vodka drinks provided to her by Jones contained anything other than vodka, let alone the sleep aid Trazodone. The record further indicates that after consuming the first vodka drink provided to her by Jones, as well as a portion of the second, K.B. blacked out and was unable to remember anything that happened until she woke in Jones' barn the next morning feeling "[n]ot good, dizzy," and woozy with her pants off and her underwear pulled down to her knees. This includes any of the events that may have transpired after Jones drove K.B. and her four-year-old daughter to McDonald's to get food, as well as what may have happened during the sexual encounter that K.B. had with Jones later that evening. This includes how Jones' semen ultimately ended up on the swabs taken from K.B.'s perianal and anal areas.

{¶ 52} Given this evidence, for Jones to now claim he did not know K.B. was substantially impaired prior to him engaging in sexual conduct with her is simply incredible given the strong, uncontradicted evidence that it was Jones himself who drugged K.B. with the sleep aid Trazodone. In reaching this decision, we again note that "'[a] substantial-impairment determination is made on a case-by-case basis, with great deference to the factfinder.'" *Kaufhold*, 2020-Ohio-3835 at ¶ 16, quoting *Kilbarger*, 2014-Ohio-2341 at ¶ 11. The jury, as the ultimate fact finder, determined that Jones knew K.B. was substantially impaired prior to him engaging in sexual conduct with her. This was not error. Therefore, because we find the state presented sufficient evidence to prove Jones knew K.B. was substantially impaired prior to him engaging in sexual conduct with her, Jones' second argument also lacks merit.

{¶ 53} Accordingly, finding no merit to either of the two arguments raised by Jones herein, Jones' fifth assignment of error alleging his conviction was not supported by

sufficient evidence lacks merit and is overruled.

{¶ 54} Assignment of Error No. 6:

{¶ 55} THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 56} In his sixth assignment of error, Jones argues his conviction was against the manifest weight of the evidence. It is well-established that "[e]ven though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence." *State v. McCombs*, 10th Dist. Franklin No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). To support this claim, however, Jones raises the same arguments that he raised in support of his fifth assignment of error alleging his conviction was not supported by sufficient evidence. Therefore, for the same reasons outlined above in our discussion overruling Jones' fifth assignment of error, Jones' sixth assignment of error arguing his conviction was against the manifest weight of the evidence also lacks merit and is overruled.

{¶ 57} Assignment of Error No. 1:

{¶ 58} JONES MUST BE RESENTENCED, AS THE TRIAL COURT SENTENCED HIM WITH AN ERRONEOUS BELIEF THAT THE SEXUAL BATTERY CONVICTION REQUIRED A PRISON SENTENCE.

{¶ 59} In his first assignment of error, Jones argues this matter should be remanded to the trial court for resentencing when considering the trial court was under the mistaken belief that R.C. 2929.13(F)(3)(c)(ii) applied to the case at bar, thereby requiring it to sentence Jones to a mandatory prison term. We agree, as the plain language found in R.C. 2929.13(F)(3)(c)(ii) indicates that statute only applies to a sexual battery conviction where the victim "is less than thirteen years of age." There is no dispute that the victim in this case, K.B., was an adult at the time the offense took place. Therefore, because the trial

- 21 -

court was under the mistaken belief that R.C. 2929.13(F)(3)(c)(ii) applied to the case at bar, thereby requiring it to sentence Jones to a mandatory prison term, we concur with Jones' argument and agree that this matter should be remanded to the trial court for the limited purpose of resentencing. Accordingly, finding merit to Jones' argument raised herein, Jones' first assignment of error has merit and is sustained.

{¶ 60} Judgment affirmed in part, reversed in part, and remanded for the limited purpose of resentencing.

M. POWELL, P.J., and HENDRICKSON, J., concur.